FILED

2012 Oct-22  AM 11:53
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KELVIN JONES,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | 5:10-cv-02958-JEO |
| **O'REILLY AUTOMOTIVE, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT and RECOMMENDATION

Kelvin Jones ("plaintiff" or "Jones") filed this action against his former employer O'Reilly Automotive, Inc., ("defendant" or "O'Reilly"), alleging that he was subjected to discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), 42 U.S.C. § 1981 ("§1981"), and the Equal Pay Act of 1963, 29 U.S.C. §206(d) ("Equal Pay Act"), as well as state law claims of assault and battery, invasion of privacy, wanton supervision, and negligent supervision. (Doc. 1). Defendant moves for summary judgment on the entirety of plaintiff's Complaint. (Doc. 29). For the reasons set forth below, the undersigned finds that defendant's Motion for Summary Judgment (doc. 29) is due to be granted.

## I.  FACTS AND PROCEDURAL BACKGROUND

Jones is an African-American male who began employment with defendant as a Parts Specialist around December 2007 in defendant's store #1207 in Huntsville, Alabama. (Doc. 1 at ¶¶ 6-7; Doc. 31-1 at 2). In February or March 2009, plaintiff was promoted to an Assistant Store Manager position. (Doc. 1 at ¶ 8; Doc. 31-1 at 5; Doc. 36 at 4). On April 7, 2010, plaintiff's position was terminated. (Doc. 32-1 at 45).

### A.  Alleged Religious Discrimination

Jones is a Christian.  (Doc. 1 at ¶ 9).  When he applied for work with defendant, he noted on his application that he was "flexible" to work every day of the week and that he was available evenings, weekends, overtime, and holidays.  (Doc. 33-1 at 2).  Jones understood that to mean that he would work two or three Sundays a month, but not every Sunday.  (Jones Dep. at 116)[1]. According to Jones, he requested time off on Sundays many times, but was always denied Sundays off.  (*Id.*).

When Jones did have Sundays off he did not necessarily attend church.  (Jones Dep. at 136-140).  Jones complains, however, that around July 2009, when Devon Masseth became the Store Manager, he began being scheduled to work more Sundays than other similarly situated employees.  Despite making numerous requests to supervisors, Human Resources, and District Managers for time off on Sundays, he "wasn't accommodated to be off on Sundays to worship with [his] family."  (Doc. 1 at ¶¶ 10-12; Doc. 36-1 at 20; Jones Dep. at 125).  Jones claims that he was "denied the right and the ability to worship," which caused him mental distress.  (Jones Dep. at 129-130).

### B.  Alleged Sexual Harassment

From about December 2008 to about July 2009, Charles Holman was the Store Manager of store # 1207.  (Doc. 1 at ¶ 14).  According to plaintiff, Holman regularly rubbed and massaged his shoulders, engaged in graphic discussions of homosexuality with two other male employees in plaintiff's presence, and displayed a nude photograph of a store employee on his laptop

---

[1]The transcript of Jones' deposition and the exhibits thereto are located at documents 39-41 in the court's electronic record of this case.  The page number references are to the transcript page, not the electronic page number, unless otherwise noted.

computer.  (Doc. 1 at ¶ 16).  Holman and the two employees also "grabb[ed] one another's

crotch, tweak[ed] one another's nipples, and wrestl[ed] in plaintiff's presence.  (Doc. 1 at ¶ 17).

Although plaintiff asked Holman to discontinue all the aforementioned activity, Holman never

complied.  (Doc. 1 at ¶¶ 18-19).  Plaintiff reported the activity to District Manager Ernie Golden

but nothing was done to stop Holman's behavior.  (Doc. 1 at ¶¶ 21-22).

　　　　Around July 2009, Holman moved to a different store and was replaced by Devon

Masseth as Store Manager.  (Doc. 1 at ¶ 24).  Masseth also rubbed and massaged plaintiff's

shoulders and often asked plaintiff to hug him.  (Doc. 1 at ¶ 25).  Plaintiff reported Masseth's

behavior to Human Resources and the O'Reilly hotline at least three times.  On August 10, 2009,

Tim Shaw, O'Reilly's Human Resource Manager, sent an email communication to Chris

Harrelson, a District Manager, in which he stated:

> Devon was witnessed making the following comment to a TM when he had a
> banana in his pocket: "Is that a banana or are you just happy to see me[.]"
> Additionally, two TMs have stated that Devon has unwantedly touched them by
> massaging there [sic] shoulders when they asked him not to.  When Devon was
> asked about this allegation he states that he may have walked by and jokingly
> bumped elbows[.]  Regardless, this can still be perceived as unwanted touching
> and is not tolerated[.]  Further incidents could result in further corrective action up
> to and including demotion or discharge.
>
> Plan/Follow up:
>
> Devon must review the harassment free workplace LMS module as well as the
> TeamNet policies for rules on conduct and Harassment-Free work environment[.]

(Doc. 33-1 at 14).  On February 26, 2010, Harrelson filled out an "Acknowledgment for

Investigative Interview," in which he stated, "I issued a corrective action to Devon Masseth for a

comment he made to a team member about having a banana in his pants or pocket and for

rubbing a team members shoulders."  (Doc. 33-1 at 16).

### C.  Alleged Disparate Pay

Plaintiff complains that a white female, Serena Coggin, was an Assistant Store Manager at another of defendant's Huntsville locations around December 2008, and was paid more than he despite the fact they had substantially similar duties.  (Doc. 1 at ¶¶ 29-31).  Coggin earned $11.50 per hour while plaintiff earned $9.00 per hour as Assistant Manager.  (Doc. 31-1 at 4-5).  Coggin was hired five months prior to plaintiff's promotion to Assistant Manager and was hired from a competitor store, where she was making $11.00 per hour.  (Doc. 31-1 at 4-5).

### D.  Alleged Racial and Retaliatory Termination

On January 26, 2010, plaintiff filed a charge of discrimination with the EEOC alleging various claims of discrimination, harassment, and retaliation. (Doc. 1 at ¶ 32).  On April 2, 2010, plaintiff and Harrelson were involved in a dispute that ended with plaintiff's store keys in Harrelson's hands.[2]  (Harrelson Dec.[3]; Berninger Dec.[4]).

In the days following, Harrelson sent several O'Reilly employees from other stores, including Jerry Hasty and Nathan Berninger, to try to persuade plaintiff to take back his keys and resume his Assistant Manager duties.  (Doc. 34-1 at 14 (Hasty Acknowledgment); Doc. 34-1 at 11 (Beringer Declaration); Jones Dep. at 200-203).  Jones refused and O'Reilly construed his refusal as a voluntary resignation.  (Jones Dep. at 203, 210-212; Doc. 34-1 at 14 (Hasty Acknowledgment); Doc. 34-1 at 11 (Beringer Declaration); Doc. 32-1 at 45).

---

[2] The events leading up to Harrelson having Jones' store keys are disputed.  However, both parties agree that Harrelson had the plaintiff's keys at the end of those events, whether Harrelson confiscated them or Jones handed them over.

[3] Harrelson's declaration is located at document 34-1 at 4 in the court's electronic record of the case.

[4] Berninger's declaration is located at document 34-1 at 11 in the court's electronic record of the case.

## II.  DISCUSSION

### A.  Motion to Strike

The defendant has moved to strike the summary judgment response and materials offered in support thereof (doc. 36, 36-1, 36-2, 36-3) submitted by Kelvin Jones.  (Doc. 37).  It asserts that the submissions fail to meet the standard set forth in Rule 56(c). The plaintiff has not filed anything in response to the motion.

FEDERAL RULE OF CIVIL PROCEDURE 56 states

(c) Procedures.

(1)  Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

(A)  citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)  showing that the materials cited do not establish the absence or presence  of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

(2)  Objection That a Fact Is Not Supported by Admissible Evidence. A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

(3)  Materials Not Cited. The court need consider only the cited materials, but it may consider other materials in the record.

(4)  Affidavits or Declarations. An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED. R. CIV. P. 56.

O'Reilly argues that Jones failed to follow all of these basic summary judgment procedures.  Specifically, O'Reilly asserts that Jones' response contains no statement of facts or legal argument. Instead, O'Reilly asserts that his Response contains

> a conglomeration of approximately 200 pages of largely and/or completely inadmissible documents in the form of his own typewritten and handwritten statements ... as well as a variety of other documents taht are not specifially cited in any of his arguments. Jones does not explain how the exhibits he offers support factual allegations because he does not *make* any clear factual allegations. Rather Jones alternates between stream of consciousness and commentary, neither of which can be considered in opposition to a motion for summary judgment.

(Doc. 37 at 2).  O'Reilly is correct.  Jones' "Response" is completely devoid of a statement of facts (or any type of response to the defendant's statement of facts) or any kind of legal arguments.  Instead, it amounts to copies of what appear to be his personal diary entries, copies of emails, and general, conclusory assertions.[5]

While Jones' "Response" is due to be struck for a number of reasons, out of an abundance of caution, the court has consider Jones' filings, to the extent it could comprehend their meaning in consideration of the motion for summary judgment.  Even considering the filings, defendant's summary judgment is due to be granted.

**B.  Summary Judgment Standard of Review**

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007)

---

[5]The court notes that Jones also submitted a handheld voice recorder that supposedly contained evidence of O'Reilly's discriminatory practices.  The court attempted to listen to the recording but found it to be completely incomprehensible.

(*per curiam*) (citation to former rule omitted); FED. R. CIV. P.56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.").[6]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue [-now dispute-] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–24.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (quoting *Anderson*, 477 U.S. at 259).  However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not

---

[6]Effective December 1, 2010, Rule 56 was "revised to improve the procedures for presenting and deciding summary-judgment motions."  FED. R. CIV. P. 56 Advisory Committee Notes.  Under this revision, "[s]ubdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word-genuine 'issue' becomes genuine 'dispute.'  'Dispute' better reflects the focus of a summary-judgment determination."  *Id.*  "'Shall' is also restored to express the direction to grant summary judgment."  *Id.*  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior versions of the rule remain equally applicable to the current rule.

significantly probative, summary judgment may be granted.  *Anderson*, 477 U.S. at 249; *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden" so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988) (quoting *Anderson*, 477 U.S. at 254). Nevertheless, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.  *Anderson*, 477 U.S. at 255.  The nonmovant need not be given the benefit of every inference but only of every reasonable inference.  *Brown v. Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).  "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment."  *Allen*, 121 F. 3d at 643.

## III.   ANALYSIS OF THE MERITS

### A.  Religious Discrimination

To establish a *prima facie* case of religious discrimination, plaintiff must present evidence that "(1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was [disciplined] for failing to comply with the conflicting employment requirement."  *Morrisette-Brown v.  Mobile Infirmary Medical Center*, 506 F.3d 1317, 1321 (11th Cir.  2007).  If the plaintiff is able to establish a *prima facie* case, the burden then shifts to the defendant to "demonstrate[] that he is unable to reasonably accommodate ... an employee's ... religious observance or practice without undue hardship on the conduct of the employer's business."  (*Id.*).

In the instant case, plaintiff cannot establish a *prima facie* case.  Jones does not assert, or even suggest, that his wish to have Sundays off was due to a "bona fide religious belief."

Instead, he simply complains that he'd like to have Sundays off so that he could occasionally go to church with his family or tend to other personal matters. (Jones Dep. at 135-139). In fact, when Jones applied for employment with O'Reilly, he noted that he was available to work all days of the week, including weekends, evenings and holidays. (Doc. 33-1 at 2). At most, Jones has established that he might like to be able to go to church every now and then. Such a desire is insufficient to establish a *prima facie* case of religious discrimination. "It is one thing to enjoy Sunday services, it is quite another to hold a sincere belief that to miss them would be forbidden by religious beliefs. *Byrd v. MPW Industrial Services, Inc.*, 2011 WL 739083 *1, *7 (M.D. Ala., Feb. 24, 2011). Because Jones has not established this element of his *prima facie* case, his religious discrimination fails as a matter of law.[7]

---

[7]Defendant construes plaintiff's complaint to also include a disparate treatment religious discrimination claim. Although the court finds defendant is being generous to suggest that plaintiff has pled such a claim, the court agrees that had the plaintiff pled a disparate treatment claim, it would be due to be dismissed as well.

To establish a *prima facie* claim of disparate treatment, Jones would have to show that (1)he is a member of a protected class; (2) he was subject to an adverse employment action; (3) his employer treated similarly situated employees who were not members of the protected class more favorably; and (4) he was qualified for the job or benefit at issue. *Johnson v. Autozone, Inc.*, 768 F. Supp. 2d 1124, 1143 (N.D. Ala. 2011)(citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 10479, 1089 (11th Cir. 2004)(citing *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253 (11th Cir. 2000)).

While Jones is a member of a protected class (Christian), he has not established that he was subjected to an adverse employment action. Instead, his religion based complaint is that he was not given Sundays off as often as he would have liked. This, however, is insufficient.

The denial of Plaintiff's requests to have Sundays off completely does not constitute an adverse employment action. During the entirety of Plaintiff's employment with Defendant, he has worked on Sundays, except during a brief training period when he started working for Defendant. Thus, the denial of his request for Sundays off does not constitute a material change in his employment. Rather, the denial maintained the status quo. While it may be far from desirable to work on Sunday evenings, Defendant's denial of Plaintiff's request to have those days off does not constitute adverse employment action.

*Dixon v. Palm Beach County Parks and recreation Dept.*, 2009 WL 200013, *5 (S.D. Fla. 2009), *aff'd* 343 Fed. Appx. 500 (11th Cir. 2009). Therefore, to the extent Jones pled a disparate treatment claim based upon his religion, summary judgment is due to be granted on the same.

### B.  Sexual Harassment

Jones alleges that he was sexually harassed first by Store Manager, Charles Holman, and later by Devon Masseth, Holman's successor Store Manager.  Specifically, Jones claims that Holman rubbed and massaged his shoulders despite his objections, "regularly engag[ed] in graphic discussions of homosexuality with two other male employees in the store in [Jones'] presence, ... displayed a nude photograph" of an employee on his laptop, and engaged in "homosexual 'horseplay' in [Jones'] presence by grabbing one another's crotch, tweaking one another's nipples, and wrestling."  (Doc. 1 at ¶¶ 14-17).  Similarly, Jones alleges that Masseth "rubbed an massaged [his] shoulders and asked [him] to hug him."  (Doc. 1 at ¶ 25).  Jones claims that he complained to management about both men's conduct, but his complaints were not resolved.  (Doc. 1 at ¶¶ 14-28).

### 1.  EEOC Administrative Remedies

"Before a potential plaintiff may sue for discrimination under Title VII, [he] must first exhaust [his] administrative remedies."  *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (citing *Crawford v. Babbitt*, 186 F.3d 1322, 1326 (11th Cir. 1999)).  "The first step down this path is filing a timely charge of discrimination with the EEOC."  *Id*. (citing 42 U.S.C. § 2000e-5(b) (1994); *Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000)).  Also, a Title VII plaintiff's "complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 589 n.8 (11th Cir. 1994).

Jones never filed an EEOC charge complaining of Holman's alleged sexual harassment. Jones did, however, file an EEOC charge on January 26, 2010, asserting that he had been

"sexually harassed in that the manager, a White male, rubs/massages my shoulders, asking for hugs repeatedly even though I have asked him not to touch me or ask me to hug him."  (Doc. 34-1 at 22).  Jones clarifies that Devon Masseth is the manager about whom he complains on his EEOC Intake Form ("Devon would ask Mr. Clay for hugs along with myself.  He would massage our shoulders asking if we needed a massage after walking up behind us.").  (Doc. 32-1 at 39-40).  Accordingly, because plaintiff did not file a charge with the EEOC concerning his claims against Holman prior to bringing this lawsuit, he failed to exhaust his administrative remedies as to those allegations, and defendant's Motion for Summary Judgment is due to be granted as to the Holman allegations on this claim.

## 2.  Hostile Work Environment

It is now well-settled that "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998).  To establish a claim for a hostile or abusive working environment, an employee must show the following:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment...; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000), *cert. denied*, 531 U.S. 1076, 121 S. Ct. 772, 148 L. Ed. 2d 671 (2001) (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238,

1245 (11th Cir. 1999) (en banc), *cert. denied*, 529 U.S. 1068, 120 S. Ct. 1674, 146 L. Ed. 2d 483 (2000)).  In *Gupta*, the Eleventh Circuit stated: "The fourth element ... is the element that tests the mettle of most sexual harassment claims.  Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere 'general civility code.'"  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).  *Gupta*, 212 F.3d at 583.  Title VII includes a prohibition of sexual harassment, but it is clearly not a federal civility code.  *Mendoza*, 195 F.3d at 1245.

"Title VII 'does not prohibit all verbal or physical harassment in the workplace,' and 'does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex.'  Instead, Title VII prohibits only the type of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's employment.'"  *Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (quoting *Oncale*, 523 U.S. at 80-81).

In *Mendoza*, the Eleventh Circuit, sitting *en banc*, reiterated the standards applicable to hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component....  The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.  The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive.  Furthermore, the objective severity of the harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.
>
> The objective component of this analysis is somewhat fact intensive. . . . The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is

12

> sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's
> employment and create a hostile or abusive working environment.

*Mendoza*, 195 F.3d at 1246 (internal quotations and citations omitted).  The Supreme Court in

*Faragher* stated, "We have made it clear that conduct must be extreme to amount to a change in

the terms and conditions of employment...."  *Faragher*, 524 U.S. at 788 (citing *Carrero v. New*

*York City Housing Auth.*, 890 F.2d 569, 577-78 (2d Cir. 1989); *Moylan v. Maries County*, 792

F.2d 746, 749-50 (8th Cir. 1986)).

    While Jones may have been bothered by Masseth's alleged conduct, he has not

established that the conduct was sexual in nature.  The Supreme Court has outlined three means

by which a plaintiff could establish that same-sex harassment is based on sex: (1) when there is

"credible evidence that the harasser was homosexual;" (2) when a "victim is harassed in such

sex-specific and derogatory terms by a [member of the same gender] as to make it clear that the

harasser is motivated by general hostility to the presence of [a member of the same gender] in the

workplace; and (3) where there is "direct comparative evidence about how the alleged harasser

treated members of both sexes in a mixed-sex workplace.  *Oncale*, 523 U.S. at 80-81).

    Jones has not put forth any evidence that Masseth is a homosexual or that he had a

general hostility towards men in the workplace.  Instead, Jones' EEOC Intake Form indicates that

he treated men and women alike ("he would stare at Latoya Steele's butt" and "sometimes

playing in [sic] her hair until she cursed him out for doing it one day") (Doc. 32-1 at 40)).

Because Jones has failed to show that any perceived harassment he may have suffered was based

on sex, his hostile environment claim fails as a matter of law.

    Additionally, plaintiff has failed to demonstrate that the conduct was sufficiently severe

or pervasive.  As noted by the defendant, the conduct was "scattered and occasional," and not sufficiently frequent to alter the terms or conditions of plaintiff's employment and create a hostile or abusive working environment.  While inappropriate, it also was not sever enough to constitute a viable claim for relief.  There is no indication in the record that plaintiff was prevented in any way from performing his job duties because of the conduct or that it interfered in any way with his ability to work.  Although plaintiff was bothered by one man touching another, he was not threatened nor did he feel endangered by the conduct.

Finally, the record is devoid of evidence that would authorize employer liability for the alleged conduct.  The United States Supreme Court in *Faragher*, 524 U.S. 775, and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998), employer liability is automatic when the supervisor's harassment results in a "tangible employment action, such as discharge, demotion, or undesirable reassignment." *Faragher*, 524 U.S. 807, *Ellerth*, 524 U.S. at 762-63.  In the absence of such action, an employer is "vicariously liable to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. *Faragher*, 524 U.S. 807, *Ellerth*, 524 U.S. at 745.  Vicarious liability may be avoided if the employer (1) exercised reasonable care to prevent and correct promptly any harassing behavior and (2) the employee unreasonably failed to take advantage of any preventive or corrective opportunities provided. *Faragher*, 524 U.S. 807, 809.

Plaintiff's harassment claim is premised on vicarious liability.  However, he is entitled to no relief for a number of reasons.  First, O'Reilly had harassment and reporting policies in place and the employees received training concerning the same.  Jones was aware of the policies

14

having seen the same published in the Handbook, being aware of posters in the store, and being

aware of the T.I.P.S. Hotline (*See* Doc. 32-1 at 43-44, 52 of 59; Doc. 33-1 at 10 of 22; Doc. 39-5

(Jones Dep.) at 18 of 21).  In fact, he made his complaint to corporate headquarters in July 2009

concerning Masseth.  Second, an investigation was conducted.  Masseth was issued a corrective

action.  (Doc. 33-1 at 16 of 22; Jones Dep. at 97-98).  There is nothing to indicate that Jones

informed the defendant that the corrective action was not effective.[8]  As best the court can

discern, plaintiff did not make any further complaint to the defendant regarding Masseth.

Accordingly, he has failed to meet the minimum standard for imposition of employer liability.

### C.  State Law Claims

#### 1.  Statute of Limitations

The defendant initially asserts that the state law claims as against Holman are barred by

the two year statute of limitations.  *See* ALABAMA CODE § 6-2-38(1) (1975).  The defendant

calculates the end date for Holman's alleged behavior based upon employee Makeeda Clay's

termination date.  (*See* Doc. 30 at 3, n.2 & 20-21).  As basis for this, the defendant cites Jones'

discovery response wherein he states,

> In and around about a month into Charles Holman's employment with O'Reilly
> Auto Parts, I started noticing Charles making uncomfortable comments about my
> height, physique and asking about sports I've played.  I would let him know that it
> was inappropriate.  I called Ernie Golden to let him know that he needed  to
> address Charles about his comments....  After reports of this to Ernie Golden,
> shortly after Charles Holman came up behind me where he rubbed, massaged and
> grabbed my shoulders two other occasions in the store with Makeeda Clay present
> to witness.  This also was reported to Ernie Golden both times.  Shortly after
> Makeeda Clay was laid off for some unfair reason by Ernie Golden.

---

[8]Jones stated in his deposition that the harassment – the touching – continued until Masseth was released.  (Jones Dep. at 103).

(Doc. 32-1 at 37 of 59).  Makeeda Clay's termination date was October 22, 2008.  (Doc. 33-1 at 8 of 22).  Jones did not file this lawsuit until November 2, 2010.  Jones does not dispute the defendant's assertion that Holman's alleged behavior did not occur after Clay's termination. Instead, he specifically states that it occurred "on two other occasions" and that Clay was there to witness both.  Therefore, the court agrees with the defendant that his claims as against Holman are time-barred.  Summary judgment is due to be granted concerning the same.

### 2.  Assault and Battery

Jones complains that Masseth "rubbed and massaged [his shoulders] and asked him to hug him."  (Doc.  1 at ¶ 25).  The Alabama Supreme Court has defined assault as

> .... an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not prevented. *Western Union Telegraph Co. v. Hill*, 25 Ala. App. 540, 542, 150 So. 709, 710 [cert. denied, 227 Ala. 469, 150 So. 711] (1933).

*Allen v. Walker*, 569 So. 2d 350, 351 (Ala. 1990).  Therefore, to prove assault, Jones must establish: (1) that Masseth touched him; (2) that Masseth intended to touch him; and (3) that the touching was conducted in a harmful or offensive manner.  *See Evans v.  Mobile Infirmary Medical Center*, 2005 WL 1840235 *1, *6-7 (S.D. Ala.  Aug.  2, 2005) (quoting *Harper v. Winston County*, 892 So.  2d 346, 353 (Ala. 2004).  "A successful assault becomes a battery." *Surrency v. Harbison*, 489 So. 2d 1097, 1104 (Ala. 1986).  The Alabama Supreme Court has found sufficient evidence of a battery where the plaintiff's supervisor "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg."  *Ex parte Atmore Community Hospital*, 719 So. 2d 1190, 1194 (Ala. 1998).

However, in that case, the "Alabama Supreme Court noted that, in order to establish that the defendant committed a battery, there must be substantial evidence that the alleged touching occurred with sexual overtones and was unwelcome." *Evans*, 2005 WL 1840235 at *6. "The Alabama Supreme Court has also held that the 'manner or spirit' in which the touching occurs is critical as to whether the tort of assault exists." *Evans*, 2005 WL 1840235 at *7 (citing *Harper v. Winston County*, 892 So. 2d 346, 353 (Ala. 2004).

The court agrees with the defendant that the "record is completely void of any evidence that Masseth's alleged touching ... 'was conducted with any offensive sexual overtones, '" or that "'the alleged touching[s] ... , [were] done in an angry, revengeful, rude, insolent, or violent manner.'" (Doc. 30 at 22 (citing *Evans*, 2005 WL 1840235 at *6)).  As such, the court finds that summary judgment is due to be granted on plaintiff's assault and battery claim as to Masseth.

### 3. Invasion of Privacy

Jones next argues that "Holman and Masseth's sexual harassment" constituted an invasion of privacy.  (Doc. 1 at ¶ 82).  Presumably, Jones contends that Holman and Masseth's conduct intruded upon his physical solitude or seclusion.[9] *See Phillips v. Smalley Maintenance Service, Inc.*, 435 So. 2d 705, 708 (Ala. 1983).  To succeed on a such a claim, Jones must show: "(1) that the matters intruded into are of a private nature; and (2) that the intrusion would be so offensive or objectionable that a reasonable person subjected to it would experience outrage, mental suffering, shame, or humiliation." *Ex parte Atmore Community Hosp.*, 719 So. 2d at

---

[9]Alabama courts "generally accept[] that the invasion of privacy tort consists of four distinct wrongs: (1) the intrusion upon the plaintiff's physical solitude or seclusion; (2) publicity which violates the ordinary decencies; (3) putting the plaintiff in a false, but not necessarily defamatory, position in the public eye; and (4) the appropriation of some element of the plaintiff's personality for a commercial use."  *Phillips*, 435 So. 2d at 708.

17

1194 (citing *Busby v. Truswal Systems Corp.*, 551 So. 2d 322, 323 (Ala. 1989)).  Under Alabama law, "the mere fact of touching does not, of itself, create a jury issue as to whether an invasion of privacy has occurred.  Instead, a court should look to the gravity of the touching, the frequency of the touching, and the other conduct relied upon by the plaintiff."  *Burden v. International Longshoremen's Ass'n, Local No. 1410*, 510 F. Supp. 2d 618, 628 (S.D. Ala. 2007).

Relying upon the factors articulated above, the court finds that plaintiff's allegations fall well short of supporting a claim for invasion of privacy.  At most, Holman and/or Masseth rubbed plaintiff's shoulders, commented about his physique, inquired into what sports he'd played, and asked him for a hug.  The alleged conduct is far more innocuous than the conduct alleged in *Burden*, *supra*.  In that case, the plaintiff alleged her co-worker picked her up and "firmly pressed his body against hers" while making an "unidentified sexual statement."  Noting that the touching lasted only a few seconds, was not on or near any sexual part of her body, that no sexual part of her co-worker's body touched her, and that the co-worker did not touch her anywhere other than her outer layer of clothing, the court granted summary judgment in the employer's favor on the invasion of privacy claim.  *Burden*, 510 F. Supp. 2d at 628.[10]  For the foregoing reasons, the court finds that summary judgment is due to be granted on plaintiff's invasion of privacy claim.

### 4.  Wanton and Negligent Supervision

Plaintiff next alleges that the defendant was wanton and negligent in supervising Holman

---

[10]*See also Beasley v. Wal-Mart Stores East, LLP*, 2009 WL 3333069 *1 (S.D. Ala., Nov. 16, 2006)(finding plaintiff failed to establish invasion of privacy where alleged harasser offered to teach plaintiff how to play strip poker, made a sexually suggestive joke about her, and asked whether she had a boyfriend in front of her coworkers); *McIsaac v, WZEW-FM Corp.*, 495 So. 2d 649 (Ala. 1986) (holding that plaintiff failed to create a jury question on invasion of privacy claim where defendant tried to kiss plaintiff, touched her on her arm on multiple occasions, put his arm around her, gave her "suggestive looks," and made repeated sexual propositions to her.)

and Masseth because "it failed to take steps to stop them from sexually harassing Plaintiff after it

was aware of facts placing it on notice that they had previously sexually harassed Plaintiff."

(Doc. 1 at ¶¶ 86-90).  The defendant asserts that these claims "cannot stand inasmuch as ... his

underlying claims of sexual harassment are due to be dismissed."  (Doc. 30 at 25).  The court

agrees.

> It has been stated generally that, in order for an employer to be liable for
> the negligent hiring, training, retention, and supervision of its employee, the
> plaintiff must also prove "wrongful conduct" on the part of the employee.
> *University Fed. Credit Union v. Grayson*, 878 So. 2d 280, 291 (Ala. 2003) ("[A]
> party alleging negligent supervision and hiring must prove the underlying
> wrongful conduct of the defendant's agents."); *Voyager Ins. Cos. v. Whitson*, 867
> So. 2d 1065, 1073 (Ala. 2003) ("A party alleging negligent or wanton supervision
> and hiring must also prove the underlying wrongful conduct of employees."); *see
> also Stevenson v. Precision Standard, Inc.*, 762 So. 2d 820 (Ala. 1999) (holding
> that a jury verdict against an employer based on negligent training and supervision
> of a supervisor who allegedly sexually harassed a fellow employee could not stand
> where the jury also exonerated the supervisor); *Smith v. Boyd Bros. Transp., Inc.*,
> 406 F. Supp. 2d 1238, 1248 (M. D. Ala. 2005) ("Under Alabama law, the finding
> of underlying tortious conduct is a precondition to invoking successfully liability
> for the negligent or wanton training and supervision of an employee."); and
> *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N. D. Ala.
> 2002) ("In order to establish a claim against an employer for negligent
> supervision, training, and/or retention, the plaintiff must establish that the
> allegedly incompetent employee committed ... [a] tort.").

*Jones Express, Inc. v. Jackson*, 86 So. 3d 298, 304 (Ala. 2010).  Because this court has already

determined that plaintiff's various claims fail as a matter of law, there is no "underlying tortious

conduct" that would invoke liability for Holman and Masseth's negligent or wanton supervision.

Even were the underlying claims sufficient, there is no evidence that the defendant is due

to be held accountable for the conduct.  In Alabama, an employer is liable for the intentional torts

of its agents and employees only if a plaintiff offers proof that"(1) the agent's wrongful acts were

in the line and scope of his employment, or (2) that the acts were in furtherance of the business of

the employer, or (3) that the employer participated in, authorized or ratified the wrongful acts."

*Potts v. BE&K Constr. Co.*, 604 So. 2d 398, 400 (Ala. 1992).  To demonstrate that an employer

ratified or tolerated wrongful acts, the plaintiff must show that the employer

> (1) had actual knowledge of the tortious conduct of the offending employee and
> that the tortious conduct was directed at and visited upon the complaining
> employee; (2) that based upon this knowledge, the employer knew, or should have
> known, that such conduct constituted sexual harassment and/or a continuing tort;
> and (3) that the employer failed to take "adequate" steps to remedy the situation.

*Id*.  In this case, there is no evidence that the defendant ratified or tolerated Masseth's conduct

toward plaintiff.  To the contrary, O'Reilly investigated the situation when informed about it and

took appropriate corrective action "reasonably calculated to halt the harassment."  *Potts*, 604 So.

2d at 401.

Consequently, the court finds that summary judgment is due to be granted on this claim

as well.

### D.  EPA, TITLE VII and DISPARATE PAY CLAIMS

Jones next claims that he received disparate pay because of his race, in violation of

Section 1981 (Count V) and Title VII (Count III), and because of his gender, in violation of the

EPA (Count VI), when O'Reilly paid Assistant Manager Serena Coggin, a Caucasian female, a

higher rate of pay than he received in the same position.  The defendant asserts that the claims

are due to be dismissed.  (Doc. 30 at 27).

A plaintiff may assert claims based on unequal pay for equal work under the EPA and

Title VII.[11]  Under both, the plaintiff must establish a *prima facie* case of discrimination.  Under

---

[11]The same analytical framework that applies to cases arising under Title VII applies to those arising under Section
1981.  *Howard v. BP Oil Co., Inc.*, 32 F.3d 520, 524, n.2 (11th Cir. 1994) (citing *Patterson v. McLean Credit Union*,
491 U.S. 164, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989)).

the EPA, the plaintiff must show that an employer has paid different wages to employees of

opposite sexes for equal work in jobs which require equal skill, effort, and responsibility and

which are performed under similar working conditions.  *See Corning Glass Works v. Brennan*,

417 U.S. 188, 195, 94 S. Ct. 2223, 2228, 41 L. Ed. 2d 1 (1974).  Under Title VII, a *prima facie*

case of sex discrimination requires showing a connection between the plaintiff's gender and the

adverse employment decision.  *Texas Department of Community Affairs v. Burdine*, 450 U.S.

248, 253, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981).  The plaintiff may establish a *prima*

*facie* case under the EPA by demonstrating that he occupied a substantially similar job and was

paid less.  *Miranda v. B & B Cash Grocery Store, Inc*., 975 F.2d 1518, 1529 (11th Cir. 1992).

Under the disparate treatment model of a Title VII action, "there is a relaxed standard of

similarity between male and female-occupied jobs, but a plaintiff has the [ultimate] burden of

proving an intent to discriminate on the basis of sex."  *Id*. at 1526.

### 1.  EPA Claim Analysis

In *Miranda*, the court stated:

> Under the Equal Pay Act there is a prescribed form of strict liability:  Once the
> disparity in pay between substantially similar jobs is demonstrated, the burden
> shifts to the defendant to prove that a "factor other than sex" is responsible for the
> differential.  If the defendant fails, the plaintiff wins.  The plaintiff is not required
> to prove discriminatory intent on the part of the defendant.

*Miranda,* 975 F.2d at 1532 (citing *Mitchell v. Jefferson County Bd. of Educ.,* 936 F.2d 539 (11th

Cir. 1991)).  The EPA prohibits employers from paying employees at a rate less than employees

of the opposite sex at the same establishment "... for equal work on jobs the performance of

which requires equal skill, effort and responsibility, and which are performed under similar

working conditions...."  *Glenn v. General Motors Corp*., 841 F.2d 1567, 1568 (11th Cir. 1988)

(quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 , 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974)).

An employee demonstrates a *prima facie* case of discrimination pursuant to the EPA by showing that a specific female comparator or comparators has earned higher wages for the same or similar job.  Once the employee presents a *prima facie* case, the employer may avoid liability by showing that the pay differences are based on (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production, or (4) a differential based on any factor other than sex.  29 U.S.C. § 206(d)(1).

Jones contends in this action that he was not offered equal pay because he is a man, and that Coggin was paid more than he was to perform the same job that he had been performing. Assuming, for the sake of this motion, that Jones is able to establish a *prima facie* case, O'Reilly contends that the disparity is justified because it was based on "factor[s] other than sex."  (Doc. 30 at 28).  Specifically, O'Reilly asserts that Jones received a pay increase to $9.00 per hour when he was promoted to Assistant Manager in March 2009.  Jones did not have any previous auto parts management experience and was promoted from within the company.  His pay was set within the range of Assistant Manager wages in the market, as dictated by prior experience, past performance, economic conditions, store/department, and profitability.  Coggin was a "strategic hire" based upon her prior auto parts experience and the fact that she could be recruited as part of a management team, along with her husband.  Coggin earned $11.00 per hour with her previous employer and O'Reilly understood that she would not come to work for O'Reilly at a reduced rate.  Coggin's starting pay with O'Reilly, and at all times while Jones was employed as Assistant Manager, was $11.50 per hour.  (Doc. 30 at 28).

As stated previously, one of the factors for removing a defendant's conduct from the requirements of the EPA is a differentiation based on a "factor other than sex." *Irby v. Bittick* , 44 F.3d 949, 955 (11th Cir. 1995).  The Eleventh Circuit Court of Appeals has stated, "In the past, we have found that such factors include "unique characteristics of the same job; ... an individual's *experience*, training or ability; or ... special exigent circumstances connected with the business." *Id*. (emphasis in text) (citing *Glenn v. General Motors Corp*., 841 F.2d at 1571 (11th Cir.).  Because Jones has not demonstrated establish that O'Reilly's proffered reasons for the pay differential are pretextual, the court finds that summary judgment is due to be granted on the EPA claim.

### 2.  Title VII Disparate Pay Claim

The appropriate framework from which to evaluate the plaintiff's claim of disparate treatment under Title VII is the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973), standard when circumstantial evidence is involved.  *Jones v. Bessemer Carraway Medical Center*, 137 F.3d 1306, 1310-11 (11th Cir.), *superseded in part on other grounds*, 151 F.3d 1321 (11th Cir. 1998).  Under the *McDonnell Douglas* framework, a plaintiff alleging discriminatory pay establishes a *prima facie* case of race discrimination by showing that (1) he is a member of a protected class and (2) that the job he occupies is similar to higher paying jobs occupied by individuals outside the protected class.  *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1529 (11th Cir. 1992).  At the outset, it is uncontested that Jones is a member of a protected class.  Thus, the sole question here is whether the job he occupied was similar to higher paying jobs occupied by individuals outside of the protected class.

The Eleventh Circuit has explained that in a comparator analysis, "the plaintiff is matched with a person or persons who have very similar job-related characteristics and who are in a similar situation to determine if the plaintiff has been treated differently than others who are similar to him." *MacPherson v. University of Montevallo*, 922 F.2d 766, 774 n. 16 (11th Cir. 1991).  The evidence shows that an employee outside of the protected class (Coggin) was paid more than Jones.  Therefore, the court assumes, for the sake of this motion, that Jones has met the requirements for a *prima facie* case for discriminatory pay.

The burden of production now shifts to O'Reilly to offer a legitimate, non-discriminatory reason for the pay differential.  To meet this burden, as noted above, O'Reilly offers that Jones received a pay increase to $9.00 per hour after he was promoted to Assistant Manager in March 2009.[12]  (Doc. 36 at 5).  Jones did not have any previous auto parts management experience and was promoted from within the company.  His pay was set within the range of Assistant Manager wages in the market, as dictated by prior experience, past performance, economic conditions, store/department, and profitability.  Coggin was hired as a "strategic hire" based upon her prior auto parts experience and the fact that she could be recruited as part of a management team, along with her husband.  Coggin earned $11.00 per hour with her previous employer and O'Reilly understood that she would not come to work for O'Reilly at a reduced rate.  Coggin's starting pay with O'Reilly, and at all times while Jones was employed as Assistant Manager, was $11.50 per hour.  (Doc. 30 at 28).

The defendant's showing is sufficient to shift the burden back to Jones to establish

---

[12]Jones asserts that his pay was not raised to $9.00 per hour until after Ernie Golden was removed from the store area as District Manager.  (Doc. 36 at 4).

pretext.  "In other words, [Jones] must demonstrate that a discriminatory reason more likely than

not motivated [O'Reilly] to pay him less, or that [O'Reilly's] explanation is not worthy of

belief."  *Miranda*, 975 F.2d at 1529 (citing *Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 1095, 67 L.

Ed. 2d 207); *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1554 (11th Cir. 1990)).  In an effort to

establish pretext, Jones argues that he, too, was a "strategic hire."  Specifically, he asserts:

> The strategic hiring of me (Kelvin Jones) was solely base [sic] on me accepting to
> be an additional counter sales/key carrier, in which a key carrier that held the
> position, abandon [sic] the job, so Pamela Wells lost an employee and regained an
> employee by hiring me to cover and fill in the void/ vacant position at O'REILLY
> AUTO PARTS store 1207 ... plus my prior work history and knowledge of auto
> parts with Advance Auto Parts where I applied, Skills of auto mechanics and
> Retail Parts Pro on my application[13] to obtain employment with O'REILLY
> AUTOMOTIVE INC., that was discussed in my interview with Pamela Wells of
> working for Advance Auto Parts in Montgomery, Alabama, the manager of store
> 1207 at the time, not Ernie Golden.  The supportive Lapel Pins[14] and written
> documentation ... discussed of my automotive background with ADVANCE
> AUTO PARTS positioned me also as a strategic hire at the time for O'REILLY ....
> Ernie Golden statement of me not being a strategic hire is unfounded and does not
> hold merit without evidence, based on personal said factual information held
> between parties.  The defendant hasn't proven that I, Kelvin Jones wasn't a
> strategic hire.

(Doc. 36 at 3).  Although Jones conclusorily asserts that he was a "strategic hire," he offers no

---

[13]On his application, under "Skills/Special Training," Jones noted, "skills auto mechanics, woodwork (basic), stereo installation, sales (retail), Parts Pro (have done parts work and sales before)." Jones makes no mention of any previous managerial experience. (Doc. 33-2 at 3).

[14]Jones offers a January 25, 2001 letter on Advance Auto Parts letterhead, which states, in pertinent part,

> You have been recognized by one of our valued customers for the exceptionally good service you
> provided. Bryson indicated that you were a "super person full of energy and focus and very helpful.",
> [sic] and he has taken the time to recognize your fine work.

> As an expression of our appreciation for your excellent customer service, I have included five Dollars
> worth of "Best Part Bucks", and a lapel pin that says, "I'm A Best Part", to wear on your uniform shirt
> collar. The pin will identify you as one of Advance's finest associates, and I trust you will wear it with
> pride whenever you wear your uniform.

(Doc. 36 at 10).

evidence to support such a claim.[15]   Coggin's application, on the other hand, reflects that she was

employed by Advance Auto Parts from August 1, 2007, to her hiring by O'Reilly as an Assistant

Manager.  (Doc. 33-1 at 22 of 22).  In light of the foregoing, the court finds that Jones has failed

to show that O'Reilly's proffered reasons for the pay differential were pretextual.  Therefore, the

court finds that summary judgment is due to be granted on Jones' disparate pay claims.

### E.  TITLE VII and SECTION 1981 TERMINATION CLAIMS

Jones lastly claims that O'Reilly terminated him because of his race and/or in retaliation

for having filed an EEOC charge against it and/or internally complained of employment practices

that he reasonably believed to be unlawful under Title VII.  (Doc. 1 at ¶ 65, 68).  Specifically,

Jones asserts:

> 32.  On or about January 26, 2010, Plaintiff filed a charge of discrimination against Defendant with the EEOC alleging various claims [of] discrimination, harassment, and retaliation under Title VII and the Equal Pay Act.

> 33. After Plaintiff filed the charge, James Leslie, his supervisor and store manager, made several remarks that Plaintiff would not be with Defendant long because of what he was trying to do to Defendant, that Plaintiff was trying to "get something for nothing," and that Plaintiff would be terminated for that.

> 34. On or about April 2, 2010, District Manager Chris Harrelson came to the store and called Plaintiff into the office with Leslie.

> 35. Harrelson was aware of Plaintiff's pending EEOC charge at the time.

> 36. In the office, Harrelson gave Plaintiff two disciplinary actions.

> 37. One was for being a "no call, no show" on Sunday, March 28, 2010.

> 38. The other was for being late from lunch on four occasions.

---

[15]Instead, Jones argues that O'Reilly "hasn't proven that I, Kelvin Jones wasn't a strategic hire."  (Doc. 36 at 3). O'Reilly, however, does not have to prove that Jones was not a strategic hire.  The burden at this juncture lies with the plaintiff.

39. Both were false and unfounded.

40. Plaintiff told Harrelson that.

41. Plaintiff asked Harrelson if they were done and he said yes.

42. Plaintiff left the office and went back out to the sales floor to go back to work.

43. Harrelson came out to the floor, approached Plaintiff, and told him to turn over his store keys.

44. Plaintiff gave his store keys to Harrelson.

45. On or about April 7, 2010, Regional Manager Billy Harris came to the store.

46. Harris called Plaintiff into the office along with Nathan (last name unknown), a manager of another store in Plaintiff's district.

47. Harris told Plaintiff that, because he had "voluntarily" turned over his keys to Harrelson and refused to take them back, he was considered terminated due to having quit.

48. Plaintiff told Harris that he did not voluntarily turn over his keys and was not quitting.

49. Harris repeated that Plaintiff was terminated due to having voluntarily quit.

50. This asserted reason was false and pretextual.

51. Plaintiff was replaced with a female who is not African-American.

(Doc. 1 at ¶¶ 32-51).

**1. Termination Based on Race**

Under both Title VII and Section 1981, Jones must first establish a *prima facie* case of discrimination to prove that he was terminated because of his race.  He can establish a *prima facie* case by showing: (1) he is a member of a protected class; (2) he was qualified for the

27

position held; (3) he was terminated; and (4) he was replaced by a person outside the protected

class.  *See Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995).

Although Jones asserts in his Complaint that he was replaced by someone outside of his

protected race class, he admitted during his deposition that his assertion was untrue.  Jones was

questioned as follows:

> Q.    You also contend that you were replaced by a female who was not
>       African-American. That was in your charge that I just read to you that you
>       said was accurate. Who was that female?
>
> A.    I don't know. I thought her name was Tessa.
>
> Q.    Tessa Rolland?
>
> A.    I don't know what her last name is.
>
> Q.    It's Rolland.  Do you know that she's an African-American female?
>
> A.    I thought she was like a Latino female.
>
> Q.    Okay.  So you don't know whether she was white or not, do you?
>
> A.    I do know.  Because I actually found that out, sir.
>
> Q.    Okay.  So that wasn't true, that was a mistake?
>
> ...
>
> Q.    Do you know that she's African-American now?
>
> A.    I found that out.

(Jones Dep. (Doc. 40-5 at 24 of 26) at 211-212).  Because Jones cannot establish that he was

replaced by someone outside of his protected class, he cannot establish a *prima facie* case of race

discrimination.  Therefore, the court finds that summary judgment is due to be granted on his

race discrimination claims.

### 2.  Retaliatory Termination

As stated by the United States Supreme Court:

> Under Title VII of the Civil Rights Act of 1964, 78 Stat. 255, as amended, 42 U.S.C. § 2000e-3(a), it is unlawful "for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]."

*Clark County School Dist. v. Breeden*, 532 U.S. 268, 269, 121 S. Ct. 1508, 1509, 109 L. Ed. 2d 509 (2001).  The appropriate framework from which to evaluate the plaintiff's retaliation claim is the same *McDonnell Douglas* standard used in the disparate treatment analysis herein.  Again, the plaintiff has the initial "burden of establishing a *prima facie* case."  *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824.  To establish a *prima facie* case of retaliation, Jones must show: (1) that he engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that the adverse employment action was causally related to the protected activity. *See Meeks v. Computer Associates Intern*, 15 F.3d 1013, 1021 (11th Cir. 1994).  Once the plaintiff establishes a *prima facie* case, the defendant employer must offer a legitimate, nondiscriminatory reason for the challenged adverse employment action.  *Meeks*, 15 F.3d at 1021.  Once the defendant has articulated its legitimate, nondiscriminatory reasons for the plaintiff's termination, the burden shifts back to the plaintiff to establish that O'Reilly's proffered reasons are pretext for unlawful termination.

For the purposes of this motion the court assumes that Jones has articulated a *prima facie* case.  In response, O'Reilly asserts its legitimate, nonretaliatory reason for his termination.  (Doc. 30 at 30).  O'Reilly claims:

> As an Assistant Manager, Jones was required to carry keys.  An Assistant
> Manager is responsible for supporting the Store Manager in all areas of security
> and cash control, including but not limited to opening and closing the store and
> securing all money in accordance with company policy.  To that end, the Assistant
> Manager carries keys to all areas of the store, including but not limited to the
> doors and the safe.  Key carrying is an essential job duty of an Assistant Manager
> and was a responsibility entrusted only to a few individuals at sore # 1207....  On
> April 2, 2010, Jones was involved in an altercation with Harrelson; the end result
> was Harrelson had Jones' keys in-hand.  The next day, Jerry Hasty, Assistant
> Manager of Store 948, went to Store # 1207 and requested Jones take his keys
> back.  He refused.  Later that day, Nathan Berninger, Store Manager of Store
> 1392, came to Store # 1207 and requested Jones take his keys back.  Jones, again,
> refused.  Due to his refusal to perform his Assistant Manager job duties and
> accept his keys back, Billy Harris, Regional Manager, informed Jones that the
> company was accepting his voluntary resignation.

(Doc. 30 at 30-31).  While Jones disputes the events leading up to his keys being in Harrelson's

hands, those events are immaterial to the court's present analysis.  A willful refusal to perform an

employee's assigned job duties is a legitimate, nonretaliatory reason for termination.  *See Leeth v.*

*Tyson Foods, Inc.*, 449 Fed. Appx. 849, 854 (11th Cir. 2011) (holding that employee's refusal to

perform certain job duties provided a legitimate, non-retaliatory reason for her suspension);

*Williamson v. Adventis Health System/Sunbelt, Inc,*, 372 Fed. Appx. 936, 940 (11th Cir. 2010)

(concluding that employee's "refusal to perform the duties to which he was assigned" provided a

legitimate, nondiscriminatory reason for the adverse employment at issue); *see also*, *Perez v.*

*Brands Mart Service Corp.*, 2011 WL 3236022 *1, *11 (S. D. Fla., July 28, 2011) ("The

defendant has shown that it terminated the plaintiff for a legitimate reason - job abandonment

based on the plaintiff's refusal to perform assigned tasks....").

        While the facts concerning the surrender of the keys initially are disputed, Jones, the only

*evidence* submitted to the court establishes that Harrelson somehow ended up with Jones' keys

on April 2, 2010, after a dispute between them.  In the days thereafter, various O'Reilly managers

(Jerry Hasty and Nathan Berninger) attempted to give Jones back his keys.  He refused to accept

them.  (Jones Dep. at 200-03).  Therefore, Jones' employment was terminated.  Jones does not

offer any evidence to rebut O'Reilly's proffered reason for his termination.  As such, the court

finds that summary judgment is due to be granted on his termination claims.

### IV.  CONCLUSION

For the foregoing reasons, the undersigned hereby **RECOMMENDS** that defendant

O'Reilly's Motion for Summary Judgment (doc. 29) be **GRANTED**.

Any party may file specific written objections to this report and recommendation within

fourteen (14) days from the date it is filed in the office of the Clerk.  Written objections shall

specifically identify the portions of the proposed findings and recommendation to which

objection is made and the specific basis for objection.  A copy of the objections must be served

upon all other parties to the action.

The Clerk is **DIRECTED** to mail a copy of this Report and Recommendation to counsel

of record and to plaintiff.

**DONE**, this the 22nd day of October, 2012.

*John E. Ott*

**JOHN E. OTT**
Chief United States Magistrate Judge